Adele **HALKIN**, et al., Appellants,

v.

Richard **HELMS**, Department of State, et al.

No. 80–2214.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 1982.

Decided Sept. 21, 1982.

As Amended Sept. 21, 1982.

Mark H. Lynch, Washington, D. C., with whom Charles S. Sims, New York City, was on the brief, for appellants.

Alfred Mollin, Attorney, Dept. of Justice, Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed and Leonard Schaitman, Attorney, Dept. of Justice, Washington, D. C., was on the brief, for Federal appellees. Barbara Herwig, Attorney, Dept. of Justice, Washington, D. C., also entered an appearance for Federal appellees.

Walter H. Fleischer, Washington, D. C., with whom James A. Bensfield, Alfred F. Belcuore and Daniel S. Goodman, Washington, D. C., were on the brief, for appellee, Ober.

John T. Boese and Joyce A. Rechtschaffen, Washington, D. C., were on the brief, for appellee, Meyer, Jr.

Eugene L. Chrzanowski, Richard W. Galiher, William H. Clarke, Frank J. Martell and William J. Donnelly, Washington, D. C., were on the brief, for appellee, Osborn.

Jon T. Brown and Stephen E. Roady, Washington, D. C., were on the brief, for appellee, Angleton.

Stephen N. Shulman and Charles R. Donnenfeld, Washington, D. C., were on the statement in lieu of brief for appellees, Helms, and Colby, et al.

Before ROBINSON, Chief Judge; MacKINNON, Circuit Judge and NORTHROP,* Senior Judge, United States District Court for the District of Maryland.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

Plaintiffs appeal several orders of the district court which resulted in the dismissal

* Sitting by designation pursuant to Title 28 U.S.C. § 294(d).

of their complaint for legal and equitable relief on claims arising out of certain activities of the Central Intelligence Agency (CIA) in the period from 1967 to 1974. The complaint alleged violations of plaintiffs' first, fourth, fifth and ninth amendments rights,[1] and of section 102(d)(3) of the National Security Act of 1947, 50 U.S.C. § 403(d)(3).[2] For the reasons set forth below, the judgment of the district court is affirmed.

## I. BACKGROUND

Appellants are 21 individuals and 5 organizations[3] who in the late 1960's and early 1970's were involved in various activities seeking to protest and secure an end to the involvement of the United States in the Vietnam War. The individual appellees are seven named persons and an unspecified number of John Does who at the time plaintiffs' claims arose were officials of the CIA or were otherwise agents or employees of the United States government. The seven appellees referred to hereinafter as the "individual appellees"[4] were sued for damages in their individual capacities. The appellees also include the heads of the CIA, FBI, Department of Defense and Secret Service, who were sued in their official capacities and with respect to whom plaintiffs sought injunctive and declaratory relief only.

Plaintiffs[5] filed suit in October 1975, after disclosures by the press and by the President's Commission on CIA Activities Within the United States[6] (the Rockefeller Commission) revealed that government agencies, including the FBI and the CIA, had conducted intelligence operations that resulted in surveillance of United States citizens who opposed the war in Vietnam. These operations included intelligence gathering activities both within and without the United States. Two such intelligence gathering programs are the focus of the present litigation.[7]

---

1. Appellants confine their contentions on appeal to claims based upon the first and fourth amendments.

2. The statute, which created the CIA under the aegis of the National Security Council, makes it the duty of the Agency

    to correlate and evaluate intelligence relating to the national security, and provide for the appropriate dissemination of such intelligence within the Government using where appropriate existing agencies and facilities: *Provided,* That the Agency shall have no police, subpena, law-enforcement powers, or internal-security functions . . .

    50 U.S.C. § 403(d)(3) (1976) (emphasis in original).

3. Nina S. Adams, Leonard Palmer Adams, II, David F. Addlestone, Samuel W. Brown, Jr., Howard J. DeNike, Adele Halkin, Steve Halliwell, Carl Whitney Jacobson, Brennon Jones, Leigh Kagan, Richard Clark Kagan, Don Luce, Angus W. McDonald, Jr., Hugh I. Manke, Jonathan Mirsky, Sidney Peck, Joseph Remcho, Daniel Schechter, Ethel Taylor, George Williams Webber, Cora Weiss, American Friends Service Committee, Inc., Clergy and Laity Concerned, Committee of Concerned Asian Scholars, Women Strike for Peace, and Institute for Policy Studies. Nine individuals and two organizations who originally appeared as plaintiffs voluntarily dismissed their claims and are not parties to this appeal.

4. The individual appellees are Richard Helms (former Director of Central Intelligence), William E. Colby (same), James R. Schlesinger (same and also former Secretary of Defense), Cord Meyer, Jr. (Assistant Director for Plans of the CIA), James J. Angleton (Chief of CIA Counterintelligence Staff), Richard Ober (CIA Counterintelligence Staff), and Howard Osborn (Director of Security of the CIA). Nineteen individuals, three privately owned communications companies, and the heads of the National Security Agency and the Bureau of Narcotics and Dangerous Drugs (the latter in their official capacities) originally named as defendants were dismissed and no appeal is taken with respect to them.

5. "Plaintiffs" refers to all of the original plaintiffs and those added in the course of the proceedings in the district court, while "appellants" refers only to those plaintiffs who are before the court on the present appeal.

6. The Commission was established by Executive Order of President Ford on January 4, 1975, Exec. Order No. 11828 (1975) and filed its final Report in June 1975.

7. The accounts of these CIA programs, as they appear in the complaint, subsequent filings in the district court, and the briefs in this appeal, are drawn chiefly from the *Report to the President by the Commission on CIA Activities Within the United States* (1975) [hereinafter cited as "Rockefeller Report"] and Book III of the *Final Report of the Select Committee to Study Governmental Operations with Respect*

## A. *Operation CHAOS*

The first program, designated by the CIA as Operation CHAOS, was an intelligence-gathering activity conducted by the CIA originally at the request of President Johnson which sought to determine the extent to which foreign governments or political organizations [8] exerted influence on or provided support to domestic critics of the government's Vietnam policies.[9] CHAOS was begun in 1967 by appellee Helms, who at the time was Director of Central Intelligence.[10] Appellee Angleton, Chief of Counterintelligence for the CIA, selected appellee Ober to head what became known as the "Special Operations Group" of the CIA's Counterintelligence staff. The Special Operations Group was responsible for the conduct of Operation CHAOS.

Over the course of several years, Operation CHAOS produced six reports for the White House and some thirty-four reports for cabinet-level officials, dealing with the subject of foreign influence on the domestic antiwar movement. In the normal course of its operations, CHAOS also produced a steady stream of reports to the FBI and other agencies detailing the results of its various intelligence activities with respect to the antiwar movement.[11]

Discovery conducted by plaintiffs in the district court revealed that among the several thousand computerized files it maintained on Americans involved in various aspects of the antiwar movement,[12] Operation CHAOS ultimately developed files on 15 of the individual appellants and the five appellant organizations.[13] The gravamen of plaintiffs' claims with respect to Operation CHAOS concerned the several known methods whereby the CIA compiled information on plaintiffs' activities.

First, CHAOS from the outset called upon CIA stations located abroad to report on the antiwar activities of U. S. citizens travelling in their areas. This reporting comprised both the routine provision of information thought by the local stations to be relevant to CHAOS requirements, and the gathering of particular intelligence at the specific request of the CHAOS office. Surveillance of Americans while abroad was conducted both through direct observation ("physical surveillance") and with the aid of electronic eavesdropping equipment.[14] CIA agents abroad also requested the assistance of friendly local intelligence agencies, or "liaison services," in maintaining electronic and physical surveillance of American subjects. The use of local liaison services facilitated both the conduct of normal surveil-

---

*to Intelligence Activities,* S.Rep.No. 94–755, 94th Cong., 2d Sess. (1976) [hereinafter cited as "Senate Report"].

**8.** Early CHAOS documents indicate the program's concern with the influence of "Soviets, Chicoms [Chinese Communists], Cubans and other Communist countries . . . . Of particular interest is any evidence of foreign direction, control, training or funding." Document Appendix (D.A.) at 13. *See* Senate Report, *supra* note 7, at 694.

**9.** According to early CHAOS documents, the domestic groups suspected of receiving such support included "radical students, anti-Vietnam war activists, draft resisters and deserters, black nationalists, anarchists, and assorted 'New Leftists.'" D.A. at 13.

**10.** Helms testified before the Rockefeller Commission that although the President never specifically directed the CIA to institute a program devoted to gathering this information, "the setting up of this unit [CHAOS] was what I conceived to be a proper action" to respond to

"almost daily and weekly" requests of the President. Helms Testimony, *quoted in* Senate Report, *supra* note 7, at 689.

**11.** Senate Report, *supra* note 7, at 696.

**12.** In addition to files containing information on the subject individual or group, the CIA's computer system indexed over 100,000 names of persons upon whom separate files were not maintained.

**13.** Because these files in some instances contained information about appellants not otherwise available to the public, the district court ordered these discovered CIA documents to be filed under seal.

**14.** D.A. at 317. The CIA has admitted that the conversations of two plaintiffs were overheard in the course of electronic surveillance conducted abroad; however, it refused to identify which two plaintiffs were involved. *See* note 28 *infra.*

lance and "most important, [the] development of informants or . . . agent penetrations within suspect groups" operating on foreign soil with whom Americans may have had contact.[15]

Second, beginning in late 1969, the CHAOS office developed its own network of informants for the purposes of infiltrating various foreign antiwar groups located in foreign countries that might have had ties to domestic antiwar activity. Although the principal focus of such infiltration was foreign groups, it is now known that informants destined for such assignments were directed to infiltrate antiwar circles within the United States for the purpose of gaining knowledge of their operations and credibility as antiwar activists. In the course of these preliminary associations, CHAOS agents apparently supplied information on the activities of domestic antiwar groups, and this information was placed in the general CHAOS data base.[16]

Third, Operation CHAOS made use of the facilities of other ongoing CIA surveillance programs. These included: (1) the CIA letter-opening program, which was directed at letters passing between the United States and the Soviet Union, and involved the examination of correspondence to and from individuals or organizations placed on a "watchlist;"[17] (2) the Domestic Contact Service, a CIA office which solicits foreign intelligence information overtly from willing sources within the United States;[18] (3) the CIA's "Project 2," which was directed at the infiltration of foreign intelligence targets by agents posing as dissident sympathizers and which, like CHAOS, had placed agents within domestic radical organizations for the purposes of training and establishment of dissident credentials;[19] (4) the CIA's Project MERRIMAC, operated by the Office of Security, which was designed to infiltrate domestic antiwar and radical organizations thought to pose a threat to the security of CIA property and personnel;[20] and (5) Project RESISTANCE, also a creature of the Office of Security, which gathered information on domestic groups without any actual infiltration.[21]

From its inception, CHAOS also regularly received information from the FBI on that agency's investigations of the domestic antiwar movement.[22]

## B. International Electronic Communications

In addition to the surveillance activities carried out under the aegis of Operation CHAOS, plaintiffs complained of the CIA's practice of obtaining the contents of international communications (telephone, telegraph and radio transmissions) by submitting subjects' names on "watchlists" to the National Security Agency (NSA). NSA possesses the technology to scan the mass of signals transmitted through various communications systems and then to select out by computer those messages in which certain words or phrases occur. It is thereby possible for that agency to acquire all communications over a monitored system in which, for example, a person's name is mentioned.[23] Between 1967 and 1973, the FBI,

15. D.A. at 21. With respect to the use of liaison services, the CIA refused to indicate whether any information concerning appellants was gained through such means.

16. *See* Senate Report, *supra* note 7, at 713–14. The CIA has admitted that CHAOS agents associated with at least one plaintiff within the United States and with an unspecified number of plaintiffs traveling in foreign countries; however, it refused to identify these plaintiffs. *See* note 28 *infra*.

17. In addition to the mail of persons who had been "watchlisted," the letter-opening program also examined randomly-selected letters moving between the United States and the Soviet

Union. *See generally* Senate Report, *supra* note 7, at 559–624.

18. *See id.* at 701–03.

19. *See id.* at 704.

20. *See id.* at 724–26.

21. *See id.* at 721–23, 728.

22. *See, e.g.,* Joint Appendix (J.A.) at 434; Senate Report, *supra* note 7, at 694.

23. Because this "vacuum cleaner" technology operates on the words or expressions contained

the Secret Service, and military intelligence agencies, as well as the CIA, submitted the names of domestic individuals and organizations on watchlists to NSA, and ultimately acquired through NSA the international communications of over a thousand American citizens.[24]

On a prior appeal, *Halkin v. Helms (Halkin I)*, 598 F.2d 1 (D.C.Cir.1978),[25] this court upheld a claim of the state secrets privilege by the Secretary of Defense and held that NSA was not required to disclose in discovery whether it had intercepted any of plaintiffs' communications. As a result of that ruling, plaintiffs' claims against the NSA and several individual officials connected with that agency's monitoring activities could not be proved, and the complaint as to those defendants was dismissed. Plaintiffs were left, however, with their claim that notwithstanding the practical bar to suit against NSA worked by the state secrets privilege, the CIA and the individuals responsible for *submitting* the watchlists to NSA could be held liable based on a *presumption* that the submission of a name resulted in interception of the named person's communications.

in communications, without reference to the identity of the speaker or receiving party, it is impossible to predict whether the presence of a name on a watchlist will result in the interception of communications to or from that person, or only of communications in which the name is mentioned. *See Halkin v. Helms (Halkin I)*, 598 F.2d 1, 11 & n. 8 (D.C.Cir.1978).

**24.** Brief for Appellants at 36. The CIA apparently submitted 30 names in the course of its use of NSA for these purposes.

**25.** A related case in this court, *In re Halkin*, 598 F.2d 176 (D.C.Cir.1979), was an action seeking a writ of mandamus to vacate a trial court order prohibiting out-of-court statements by the parties on information produced in the course of discovery.

**26.** Where they occurred, the redactions were labeled by letter and number according to the following code:

1—Words or text denoting or revealing CIA field stations, bases or components.

2—Cryptonym, sensitivity indicator or information-handling indicator.

3—Words or text identifying a CIA employee or organizational component.

4—Security classification of the document.

## C. *History of the litigation*

### 1. *Discovery*

Since this action was filed in October 1976, the parties have fought the bulk of their dispute on the battlefield of discovery. Shortly after filing their complaint, plaintiffs sought the production of documents concerning (1) the conduct of Operation CHAOS in general, and (2) CHAOS surveillance of plaintiff individuals and organizations in particular. A large number of documents responsive to plaintiffs' request were produced, but with portions claimed to disclose sensitive information redacted.[26] Approximately 200 responsive documents were withheld in their entirety.[27] Subsequently, as public reports further disclosed the extent of CIA domestic activities, plaintiffs in July 1977 sought additional discovery in the form of (3) requests for admissions that the CIA or foreign "liaison services" had conducted various types of surveillance against each plaintiff or against nonparty organizations to which plaintiffs belonged; (4) further interrogatories seeking more detailed justification of the redaction and withholding of documents

A—Information obtained from or about the investigative or intelligence activities of another United States Government agency.

B—Words or text identifying an intelligence security service of a foreign government in liaison with CIA, or information obtained from such liaison relationship with CIA.

C—Irrelevant information or words identifying a non-party whose privacy interests are entitled to protection from disclosure.

D—Words or text identifying or aiding the identification of CIA foreign intelligence or counterintelligence sources or methods.

An examination of the redacted documents confirms that the redacted portions are indeed identification words, codes, or figures. Such confirmation, of course, says nothing about the *justifiability* of the redactions in a discovery context.

**27.** The CIA furnished brief descriptions of documents that were entirely withheld (*e.g.*, "Dispatch dated 1 August 1968, information in dissident activity abroad, mentions [plaintiff] in passing").

previously requested; (5) a request for the production of documents concerning the conduct of operations MERRIMACK and RESISTANCE and any documents generated by those operations which concerned the plaintiffs; and (6) CHAOS documents concerning several plaintiffs who had moved to intervene in the litigation (and whose intervention was ultimately permitted).

The CIA declined to supply all of the information requested by plaintiffs. With respect to the identification of plaintiffs who had been the subjects of surveillance under the CHAOS program or by virtue of watchlists submitted by the CIA to NSA, the CIA claimed that more than the limited disclosure already given [28] would reveal the identities of covert sources and disclose the existence of liaison relationships with foreign intelligence services, and that therefore this information was privileged from discovery. The CIA declined on grounds of relevance to answer the interrogatories concerning surveillance of nonparty organizations to which plaintiffs belonged. It declined to answer plaintiffs' interrogatories seeking more detailed explanations of the redactions in the documents it had produced, continuing to assert the adequacy of its number-and-letter coded explanations as to both the documents earlier produced and newly produced documents. Finally, it refused to disclose whether any plaintiffs' names had been submitted on watchlists to NSA by the Special Operations Group.

In January 1978, plaintiffs pursuant to Fed.R.Civ.P. 37 filed a motion to compel the Director of the CIA to respond to plaintiffs' interrogatories and requests for production of documents.[29] The CIA responded with two affidavits by then-Director Stansfield Turner formally claiming that the requested information was protected from discovery by the state secrets privilege.[30] The first affidavit was for the public record, and stated essentially that the identities of liaison services and casual and CIA-paid informers who had provided information to the CHAOS program would likely be revealed if further identification of particular instances in which plaintiffs had been subjected to surveillance was provided, and that such revelations of secrets of state would damage the national security.[31] The second affidavit, classified "SECRET" by the agency, was submitted to the court *in camera*. It made the same claim of privilege, but "in somewhat greater detail."[32]

In a memorandum opinion filed August 30, 1978, the district court upheld the CIA's claim of the state secrets privilege and denied plaintiffs' motion to compel.[33] Placing

---

**28.** The CIA had admitted in the course of discovery that various identified and unidentified plaintiffs were on several occasions the targets of CHAOS surveillance or were subjected to surveillance in the course of CHAOS operations directed at other subjects. Specifically, it appears that under Operation CHAOS, the CIA (1) opened and copied the mail of three identified plaintiffs within the United States (J.A. 431–32); (2) targeted the mail of at least two identified plaintiffs for opening (D.A. 34–41); (3) had CHAOS agents attend private meetings of unidentified plaintiff organizations (D.A. 253–281); (4) collected nonpublic information on nine other identified plaintiffs (J.A. 760 & sealed exhibits); (5) electronically surveilled two unidentified plaintiffs abroad in the course of operations directed at other persons (J.A. 426); (6) had two agents who "were associated" with at least one unidentified plaintiff within the United States (J.A. 434); and (7) had agents who "associated" with an undisclosed number of unidentified plaintiffs abroad, in the course of operations directed at other persons (J.A. 434).

**29.** J.A. at 521.

**30.** The Turner affidavits also invoked a "statutory privilege arising from section 102(d)(3) of the National Security Act of 1947." J.A. at 542–43. That section, codified at 50 U.S.C. § 403(d)(3) (1976), provides that "the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure." The merits of this asserted privilege were not discussed by the district court and are not at issue on appeal.

**31.** J.A. at 539.

**32.** Turner Public Aff., ¶ 5 (J.A. at 543). The *in camera* affidavit has been inspected by this court.

**33.** J.A. at 590. The claim of the state secrets privilege did not extend to the interrogatories concerning surveillance of organizations to which plaintiffs belonged (to which the agency had objected on grounds of relevance) or to the

heavy reliance upon the *in camera* affidavit of Director Turner, the court ruled that the claim of privilege met the procedural requirement set forth in *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), and had "overwhelming support" on its merits. The court specifically accepted the CIA's assertion of the privilege against plaintiffs' demand for further explanation of redactions made in released documents.[34]

In February 1979, plaintiffs filed a further motion to compel discovery. This motion concerned the CIA's refusal to provide, in response to plaintiffs' original Rule 34 request for production, documents relating to Operation CHAOS that had been prepared for and used in the testimony of CIA officials before the Senate and House Intelligence Committees. Defendants opposed this motion with letters from the Chairman and Vice-Chairman of the Senate Select Committee on Intelligence and the Clerk of the House (who is charged with the custody of House records), voicing the objection of those officers to disclosure of the testimony or background materials.[35] The district court, crediting the objections, denied plaintiffs' motions without opinion.[36] A subsequent motion urging that notwithstanding the congressional officers' objections, the documents were not privileged under the Speech or Debate Clause, U.S.Const.Art. I, § 6, was likewise denied.[37]

In the course of their efforts to obtain discovery from the CIA, plaintiffs also subpoenaed certain records of the President's Commission on CIA Activities Within the United States (the "Rockefeller Commission"), which were in the possession of the Archivist of the United States.[38] The Archivist made a significant portion of Commission materials available in the summer of 1979, but with redactions made at the behest of the CIA.[39] Plaintiffs filed a motion to compel the Archivist to comply fully with the subpoena. This motion was denied in May 1980 without opinion, presumably on the strength of an affidavit of an Assistant General Counsel of the CIA to the effect that the redactions by the Archivist corresponded to those made by the CIA of its CHAOS documents pursuant to the state secrets privilege which the district court had previously upheld.[40]

In addition to the foregoing attempts to conduct discovery through interrogatories and document production requests, plaintiffs sought to take the oral depositions of several past or present CIA officials named as defendants. In response, the CIA officials moved under Fed.R.Civ.P. 26(c) for a protective order limiting the depositions.[41] Most prominently, the defendants urged that they be deposed only upon written interrogatories as provided for in Fed.R. Civ.P. 31. This procedure, it was argued,

---

production of documents concerning the MERRIMACK or RESISTANCE projects. However, the court refused to compel discovery as to these matters as well. With respect to the organizations of which some plaintiffs were members but which were not themselves plaintiffs—some 25 in number, according to the plaintiffs—the court held that discovery would work an undue burden if permitted to extend beyond the immediate plaintiffs, which included at that time the organizations appearing as appellants here. The court declined to order discovery on the MERRIMACK and RESISTANCE projects on the ground that disclosures made to that point, coupled with information available under FOIA, would provide all the information plaintiffs required. J.A. at 593–94.

**34.** Plaintiffs' motion for reconsideration in light of the adoption of a new Executive Order, E.O. 12065, 3 C.F.R. 190 (1979), which superseded the prior Executive Order governing the classification of information concerning the national

security, was denied. Pending decision of this appeal, E.O. 12065 was itself superseded by E.O. 12356 (1982). *See* note 65 *infra.*

**35.** The documents sought, which included verbatim transcripts of the testimony itself, J.A. at 629, were in the physical possession of the CIA.

**36.** J.A. at 654.

**37.** J.A. at 685.

**38.** J.A. at 595.

**39.** *See* J.A. at 688. The redactions of the Rockefeller Commission documents were not explained by number-and-letter code.

**40.** J.A. at 758–59.

**41.** J.A. at 598.

would permit the defendants to review their answers to questions so as to insure that no privileged information was divulged.

The court rejected defendants' proposed protective order, but entered an order requiring plaintiffs to serve their initial questions upon the deponents in writing and far enough in advance to permit the CIA to evaluate the need to assert the state secrets privilege with respect to matters inquired into. Questions objected to on national security grounds were not permitted to be asked at the oral depositions, and oral follow-up questions to the written questions were also confined to matters not objected to on national security grounds. Plaintiffs subsequently propounded written questions to be asked of several defendants, and defendants objected in part. The district court, because of its disposition of plaintiffs' claims, never found it necessary to rule on the objections, and the depositions were never taken.

2. *Disposition of plaintiffs' claims*

(a) *Individual defendants*

Seven of the present appellees are individuals who are or were officials of the CIA or the Department of Defense. These individuals were sued for damages based on asserted violations of plaintiffs' rights under the Constitution, on the well-established theory that certain provisions of the Constitution provide direct actions for damages arising from their violation.[42] The claims against these defendants were disposed of in two phases.

Defendants Howard Osborn and James J. Angleton were, respectively, the CIA's Director of Security and Chief of Counterintelligence Staff at the time plaintiffs'

claims arose. They moved in May 1978 to dismiss the complaint against them for lack of jurisdiction over their persons, on the theory that because they lived and worked in Virginia (where CIA headquarters is located), they lacked sufficient contacts with the District of Columbia to give the court power over them. After directing plaintiffs to adduce evidence showing both venue under 28 U.S.C. § 1391(b) and personal jurisdiction under the District of Columbia long-arm statute, D.C.Code § 13–423, the court found the proffered evidence of contacts with the District insufficient and dismissed the complaint as to Osborn and Angleton in August 1978 for lack of jurisdiction.

Former CIA Directors William Colby and Richard Helms, former Secretary of Defense James R. Schlesinger (also a former CIA director), Richard Ober (head of the CHAOS program) and Cord Meyer, Jr. (Assistant Deputy Director for Plans of the CIA), remained parties. With the district court's ruling upholding the CIA's claim of the state secrets privilege, however, it became clear that plaintiffs would be unable to adduce evidence to prove any of the details of their claims based on (1) physical and electronic surveillance by the CIA; (2) surveillance conducted by foreign intelligence (liaison) services; or (3) infiltration of plaintiff organizations or other groups to which plaintiffs belonged. Without access to documents identifying either the subjects of CHAOS surveillance or the types of surveillance used against particular plaintiffs, the likelihood of establishing injury in fact, causation by the defendants, violations of substantive constitutional provisions, or the quantum of damages was clearly minimal.

Based on the plaintiffs' evident inability to prove their claims, the five individual

---

**42.** The availability of such a remedy was first announced in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), in which it was held that a damage action lay against federal law enforcement agents for acts that violated the plaintiff's fourth amendment rights. The courts have subsequently implied damage remedies against federal officials under other constitutional guarantees. *See, e.g., Carlson v. Green,* 446

U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (eighth amendment proscription of cruel and unusual punishment); *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (fifth amendment due process clause guarantee of equal protection of the laws); *Dellums v. Powell,* 566 F.2d 167 (D.C.Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978) (first amendment freedoms of speech and association).

defendants moved for summary judgment on the claims except those involving letter-opening.[43] The court, with plaintiffs' concession that they could not prove a set of facts entitling them to relief,[44] subsequently granted summary judgment in favor of the individual defendants.

(b) *Defendants sued in their official capacities*

The heads of the CIA, FBI, Department of Defense and Secret Service were sued in their official capacities for injunctive and declaratory relief. The plaintiffs sought thereby to prevent the government from any future surveillance of the sort alleged to have taken place in the course of Operation CHAOS.

In June 1979, the agency heads filed a motion under Fed.R.Civ.P. 56(b) and 12(b)(6) for summary judgment, or in the alternative for failure to state a claim upon which relief could be granted, on all of plaintiffs' claims for injunctive and declaratory relief.[45] The grounds for this motion were that: (1) Operation CHAOS had been terminated in 1974; (2) the United States' involvement in the Vietnam War, resistance to which had been the subject of CHAOS and related intelligence activities, had ended in 1973; (3) the CIA had not collected any information on plaintiffs since 1974; and (4) the promulgation in 1978 (in response to the Rockefeller Commission report) of Executive Order 12036, 3 C.F.R. 112 (1979), governing the gathering of intelligence about U. S. citizens, and the adoption of informal CIA directives implementing that Order, had eliminated any likelihood of future surveillance of the types that plaintiffs alleged had violated their rights.

Plaintiffs opposed the government's motion, claiming that the newly-signed Executive Order in fact continued to render them subject to surveillance by the various intelligence agencies, and that in any event, they were entitled to an injunction prohibiting future unconstitutional surveillance and a declaration that Operation CHAOS violated their rights.

The court granted the motion of the agency heads on June 5, 1980. With respect to the claims based on the submission by the CIA of watchlists to NSA, the court noted that our decision in *Halkin I* upholding the NSA's state secrets privilege had prevented discovery of information that would disclose whether NSA had in fact intercepted plaintiffs' communications, and had also rejected the claim that the inclusion of plaintiffs' names on a NSA watchlist required the presumptive inference that their communications had been intercepted.[46] The district court ruled that, as a result of being unable to demonstrate the actual interception of their communications, plaintiffs would be unable to prove any liability on the part of the CIA and its officials, and hence could not make out a case for injunctive or declaratory relief against the agency. The watchlisting claims were consequently dismissed.

With respect to the claims based on Operation CHAOS, the district court rejected plaintiffs' contention that there existed a likelihood of their being subjected to CIA surveillance in the future. "The Court believes that this is hypothetical or speculative harm which is insufficient to support the grant of declaratory or injunctive re-

---

**43.** In the face of this motion, the parties agreed to dismiss the letter-opening claims against the individual defendants with prejudice in return for defendants' bearing $7,000 in costs. *See* J.A. 778.

**44.** J.A. at 776.

**45.** J.A. at 668. Excluded from this motion were claims growing out of the CIA's maintenance and dissemination of files relating to plaintiffs. These claims were ultimately dismissed by stipulation in August 1980 upon the

government's agreement to pay $7,000 of plaintiffs' costs. J.A. at 781.

**46.** *See Halkin I,* 598 F.2d at 10–11. Noting that the state secrets privilege was being claimed by the United States, and not by or on behalf of the defendants, we held that "[n]ot only would such a presumption [of interception] be unfair to the individual defendants who would have no way to rebut it, but it cannot be said that the conclusion reasonably follows from its premise." *Id.* at 11.

lief." [47] It therefore entered summary judgment in favor of defendants on all claims for injunctive and declaratory relief.

### (c) *Dismissal of four plaintiffs for failure to make discovery*

All plaintiffs were served with some 240 interrogatories by the defendants in late 1976.[48] These interrogatories sought, *inter alia,* information about plaintiffs' political activities, the factual bases of the allegations contained in the complaint, the injuries sustained by plaintiffs, and the damages sought. After several stipulated time extensions, plaintiffs objected to the vast majority of the interrogatories.[49] Two of the organizational plaintiffs ultimately dismissed filed timely answers to those relatively few interrogatories to which they did not object. The defendants then filed a motion to compel.

In July 1977, the court entered an order ruling on plaintiffs' objections and incorporating certain agreements as to the interrogatories that the parties had reached at the urging of the court. The court rejected plaintiffs' objections based on the presence of information in public reports and many of the objections to relevance. It deferred plaintiffs' obligation to answer questions relating to damages, plaintiffs' legal theories, and "areas covered by the attorney-client privilege" until plaintiffs had made further discovery. Plaintiffs were given 14 days in which to answer the remaining interrogatories "or the claims asserted by such plaintiffs shall be dismissed with prejudice." [50]

Plaintiffs failed to comply with that deadline, and were granted an extension of time to August 18, 1977. The order extending the time for filing stated that upon failure to file timely answers, "this court will entertain briefs on the issue of what sanctions, if any, should be imposed . . . ." [51] Appellants Cora Weiss, American Friends Service Committee, Clergy and Laity Concerned, and Institute for Policy Studies failed to file their answers by August 18; a motion for further extension was denied. After a hearing, the court on May 24, 1978 granted CIA's motion to dismiss the noncomplying plaintiffs. Plaintiffs' motion in the interim for discovery sanctions against defendants based on similar lapses was denied.

## II. Issues on Appeal

With judgment or a final order entered on all of plaintiffs' claims, this appeal was filed. The errors urged by appellants fall essentially into three categories: (1) those concerning the merits of and the consequences flowing from the district court's upholding of the government's claim of state secrets privilege (including the restrictions on discovery necessitated by that ruling); (2) those concerning other restrictions of the plaintiffs' discovery (the congressional materials, the submission of deposition questions in advance, and the sustaining of the CIA's objections to the relevance of plaintiffs' interrogatories); and (3) those

---

**47.** J.A. at 767, *citing Laird v. Tatum,* 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972) *and O'Shea v. Littleton,* 414 U.S. 488, 495-96, 94 S.Ct. 669, 675-676, 38 L.Ed.2d 674 (1974).

**48.** At that time, the defendants present here as appellees were all represented by the Justice Department. In October 1977, various private counsel undertook the representation of the individual appellees except for appellee Schlesinger.

**49.** Many of plaintiffs' objections were that the personal information sought about their political, social, financial and travel situations or habits was irrelevant to any claim or defense, or sought information already in the public record (*i.e.,* in the congressional committee and presidential commission reports on CIA activi-

ties) or in defendants' possession. Such information would therefore in plaintiffs' view have been unduly burdensome to compile. The bulk of the remaining objections was based on the claim that answers to questions about plaintiffs' legal theories and the specific facts giving rise to their claims could properly be made only after plaintiffs completed their own discovery. In other instances, chiefly those in which the question sought information about the conduct of the litigation itself, the objections also relied on claims of privilege.

**50.** J.A. at 338–39.

**51.** J.A. at 377.

concerning the availability of declaratory and injunctive relief for the constitutional violations plaintiffs alleged. Were the appellants to prevail on aspects of these assigned errors to the extent that appellees' liability might be made susceptible of proof, the court would additionally face the questions raised by the district court's dismissal of four of the plaintiffs as a discovery sanction and its dismissal of appellees Osborn and Angleton for want of personal jurisdiction.

## III. DISCUSSION

### A. *The State Secrets Privilege*

Plaintiffs. explicitly conceded in the district court that the successful invocation of the state secrets privilege by the Director of Central Intelligence made it impossible for them to go forward with their claims for *damages* based on statutory and constitutional violations occurring as a result of Operation CHAOS. Without access to the facts about the identities of particular plaintiffs who were subjected to CIA surveillance (or to NSA interception at the instance of the CIA), direct injury in fact to any of the plaintiffs would not have been susceptible of proof.[52]

■ Because the state secrets privilege, like other evidentiary privileges, operates to foreclose relief for violations of rights that may well have occurred by foreclosing the discovery of evidence that they did occur, it is a privilege "not to be lightly invoked." *United States v. Reynolds,* 345 U.S. 1, 7, 73 S.Ct. 528, 531, 97 L.Ed. 727 (1953). Its

invocation must be carefully considered to assure that the proper balance is struck between the interest of the public and the litigant in vindicating private rights and the public's interest in safeguarding of the national security. We turn to that consideration.

### 1. *General principles*

■■ The starting point for any analysis of a claim of the state secrets privilege is *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). That case establishes that secrets of state—matters the revelation of which reasonably could be seen as a threat to the military or diplomatic interests of the nation [53]—are *absolutely privileged* from disclosure in the courts. Although the courts in evaluating claims of the privilege may take cognizance of the need for the information demonstrated by the party seeking disclosure, such need is a factor only in determining the extent of the court's inquiry into the appropriateness of the claim.[54] Once the court is satisfied that the information poses a reasonable danger to secrets of state, "even the most compelling necessity cannot overcome the claim of privilege . . . ." *Id.* at 11, 73 S.Ct. at 533.

■ Therefore, the critical feature of the inquiry in evaluating the claim of privilege is not a balancing of ultimate interests at stake in the litigation. That balance has already been struck. Rather, the determination is whether the *showing* of the harm that might reasonably be seen to flow from disclosure is adequate in a given case to trigger the absolute right to withhold the information sought in that case.

**52.** As was noted in *Zweibon v. Mitchell,* 516 F.2d 594, 611 (D.C.Cir.1975) (en banc) (plurality opinion of Wright, J.), damages for fourth amendment violations under *Bivens* are "recoverable [only] upon proof that injuries resulted from the violation."

**53.** 345 U.S. at 10, 73 S.Ct. at 533. *Reynolds* itself involved a military secret. However, the privilege extends to matters affecting diplomatic relations between nations. *See, e.g., Attorney General v. The Irish People, Inc.,* 684 F.2d 928 (D.C.Cir.1982); *Republic of China v. Nat'l Union Fire Ins. Co.,* 142 F.Supp. 551 (D.Md. 1956). *See generally* Note, *The Military and State Secrets Privilege: Protection for the Na-*

*tional Security or Immunity for the Executive?* 91 Yale L.J. 570, 576–77 (1982).

**54.** Where the need can be substantially met through less intrusive means, the court's scrutiny of the basis for the claim of privilege need not be as searching as it would be where the privileged evidence is the only means of proving a claim or defense. In *Reynolds,* for example, the Court ruled that submission of the desired documents—Air Force accident reports—for *in camera* review was inappropriate in view of the fact that live witnesses and investigator, were available to testify on the accident.

A second inquiry may be posed once the government—whether as a party to the litigation or simply as the person having legal control over the information involved—has successfully invoked the privilege. The question then becomes whether the case is to proceed as if the privileged matter had simply never existed, with the parties bearing the consequent disadvantages (or advantages) of this sudden disappearance, or instead should proceed under rules that have been changed to accommodate the loss of the otherwise relevant evidence. Such changes could compensate the party "deprived" of his evidence by, for example, altering the burden of persuasion upon particular issues, or by supplying otherwise lost proofs through the device of presumptions or presumptive inferences. In *Halkin I,* we declined the invitation to engage in such an alteration of the parties' burdens. *See* 598 F.2d at 11. Insofar as that ruling represents the law of the case, we must likewise decline to do so here. *See generally Salisbury v. United States,* 690 F.2d 966 (D.C.Cir. 1982).

### 2. *Privilege questions raised by the present appeal*

Turning to the facts of the present case, we find the state secrets privilege involved in two of the errors urged by appellants. The first concerns the district court's refusal to compel the defendants to answer interrogatories and produce documents relating to the conduct of Operation CHAOS. The second concerns the court's dismissal of plaintiffs' claims for relief based on the CIA's admitted submission of "watchlists" to NSA, on the ground that any interception of plaintiffs' communications was privileged.

As reviewed above, the government refused to respond to interrogatories or produce documents disclosing either the identities of plaintiffs who were subjected to CHAOS surveillance or the means of such surveillance. The claim of privilege was asserted in both the public and classified *in camera* affidavits of Stansfield Turner submitted in his capacity as Director of Central Intelligence. Appellants urge that the claim of privilege was defective in several respects and that the district court's denial of their motion to compel discovery was therefore an abuse of discretion.

As the government argues, appellants' "only objections to the district court's upholding of the privilege are procedural." Since that ruling resulted in maintaining the secrecy of the information sought, it is scarcely surprising that appellants have not chosen to contest the sensitivity of the information on its merits. Even had they the means and the desire to do so, our task would be no different, for the standard set down in *Reynolds* is itself purely a procedural framework for testing claims of privilege.

*Reynolds* set forth three threshold requirements for claims of the state secrets privilege: that there be "a *formal* claim of privilege, lodged by the *head of the department* which has control over the matter, after *actual personal consideration* by that officer." 345 U.S. at 7–8, 73 S.Ct. at 531–532 (emphasis added; footnotes omitted). It is undisputed that these requisites are met here. Beyond this, "the court must be satisfied from all the evidence and circumstances, and 'from the implications of the question, in the setting in which it is asked, that a responsive answer to or an explanation of why it cannot be answered might be dangerous because injurious disclosure might result.'" *Id.* at 9, 73 S.Ct. at 532, *quoting Hoffman v. United States,* 341 U.S. 479, 486–87, 71 S.Ct. 814, 818–819, 95 L.Ed. 1118 (1951) (discussing privilege against self-incrimination).

We hold that the district court acted well within its discretion in finding the Director's affidavits adequate to establish the reasonable danger of injury. We think that the additional showings appellants would require by analogy to claims of exemption under the Freedom of Information Act [55] are both unnecessary and unwise.

**55.** 5 U.S.C. § 552 (1976).

Appellants' attack on the showing made by the CIA to justify the privilege with respect to CHAOS information is three-fold. First, appellants argue that the Director's *public* affidavit was too vague to establish the privilege. Second, they contend that the court's reliance upon the Director's *in camera* affidavit improperly deprived them of an opportunity to litigate the privilege question. Third, with particular regard to the refusal to produce (and the redaction of) CHAOS documents, appellants argue that the government should have been compelled to supply a more detailed explanation of *each* withholding and redaction than the letter-and-number code provided. These contentions are considered in order.

1. The value of rules for determining the adequacy of the sort of affidavits involved here varies inversely with the breadth of such rules. As the court in *Reynolds* recognized, it is the circumstances in which a demand for information is made and the "implications of the [demand] in the setting in which it is asked," 345 U.S. at 9, 73 S.Ct. at 532, that will provide the commonsense guide to resolving the adequacy question. We think that the Director's public affidavit, read against the background of the widespread public disclosures about the conduct of Operation CHAOS on the one hand and the undeniable sensitivity of our diplomatic relations on the other, alone suffices to satisfy the requirements of the privilege.

It is evident from the descriptions of the CHAOS program found in the Rockefeller Commission and Senate reports that the CIA's conduct of Operation CHAOS extended to the surveillance of foreign citizens both here and abroad. It relied upon the cooperation of foreign intelligence services, and upon the information supplied by CIA agents who were undercover both here and abroad. The Director's public affidavit, while necessarily unspecific, set forth the grounds requiring secrecy in this context.[56]

56. The affidavit stated in part:

9. As a step in analyzing whether or not such foreign influence in fact existed, information regarding the international travels and contacts of identifiable protest leaders was collected. Much of this information could only be collected through, or with cooperation of, foreign governments in a position to monitor such travel. Consequently, in significant part the information recoverable from the files of the CHAOS project is information either supplied by foreign governmental liaison sources or otherwise witnessing their cooperation. While in a general sense it may be acknowledged that CIA derives information through liaison arrangements with foreign governments, the fact of CIA interaction with authorities of a particular foreign government may not be acknowledged without damaging U. S. diplomatic or intelligence relationships with that government. Secrecy is the *sine qua non* of liaison arrangements and breach of the understanding of confidentiality will predictably lead to a diplomatic incident, or restriction and disruption of cooperative intelligence relationships, or both. Consideration of the confidential nature of the relationship requires that both liaison-derived information and the location of CIA stations abroad be protected from disclosure.

10. The collection of information of a type from which an informed judgment could be made regarding foreign influence was also undertaken through the solicitation of information from persons in contact with protest leaders, both casual informants and individuals paid by CIA to collect such information. The identities of these individuals must be protected. In many cases the nature of the information reported is enough to single out who it is that acted as the CIA source. If CIA cannot deliver on its pledge of confidentiality in soliciting information from otherwise reluctant sources, such sources will simply be unavailable in the future. In the case of persons acting in the employ of CIA, once their identity is discerned further damage will likely result from the exposure of other intelligence collection efforts for which they were used.

11. In response to interrogatories presented by the plaintiffs, it has been acknowledged that conversations of two of the plaintiffs were overheard as a result of electronic surveillance operations conducted outside the United States by agents of the Central Intelligence Agency, although the plaintiffs were not the actual targets of the electronic surveillance. Mail sent to or addressed by three plaintiffs and intercepted by CIA has been released to them. It has been further acknowledged that agents of the Central Intelligence Agency associated with plaintiffs with a result that information was provided to the Special Operations Group, although the ultimate goal of such association was to gain access to foreign intelligence targets. The disclosure of additional information regarding the instances of electronic surveillance or

It is self-evident that the disclosures sought here pose a "reasonable danger" to the diplomatic and military interests of the United States. Revelation of particular instances in which foreign governments assisted the CIA [57] in conducting surveillance of dissidents could strain diplomatic relations in a number of ways—by generally embarrassing foreign governments who may wish to avoid or may even explicitly disavow allegations of CIA or United States involvements, or by rendering foreign governments or their officials subject to political or legal action by those among their own citizens who may have been subjected to surveillance in the course of dissident activity.[58]

■ Similarly, the identities of CIA operatives who contributed information to CHAOS (both those hired by CHAOS itself and those attached to other departments within the agency) are self-evidently the sort of information which if disclosed could harm national security or diplomatic interests. Without considering the risk to the individuals involved,[59] it is obvious that the exposure of one who acted—and indeed may still be acting—as a CIA operative here and abroad [60] would pose a threat to our diplomatic and military interests. See Military Audit Project v. Casey, 656 F.2d 724, 749 (D.C.Cir.1981). Information that permitted one of the appellants to determine that he, she, or it had been the subject of surveillance might also be sufficient, when combined with knowledge of the individual's other activities, to identify CIA operatives as having participated in activities abroad that were heretofore assumed free of such involvement, or as having had access to information previously assumed to have been secure.[61]

agent reporting, particularly the requested dates of such occurrences and the respective plaintiffs involved, cannot be disclosed without permitting the plaintiffs to divine the particulars of such surveillance or the identities of those who acted as informants.
J.A. at 541-42.

57. Appellants argue that they have never sought the identities of any CIA operatives or liaison services, but only the identities of the *plaintiffs* who were subjected to surveillance. However, it is clear that armed with this information and the mass of facts to be culled from the public record of CHAOS activities, it might well be possible for appellants and others to deduce such identities based upon their personal knowledge of their own contacts, activities and whereabouts. We have said that intelligence gathering is "akin to the construction of a mosaic [in which] [t]housands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate." *Halkin I,* 598 F.2d at 8. This is no less true of attempts to penetrate the practice of intelligence-gathering itself. In *Halkin I,* we barred discovery of the identity of plaintiffs whose communications had been intercepted by NSA, noting that "the identity of particular individuals whose communications have been acquired can be useful information to a sophisticated intelligence analyst." *Id.* at 9. Surely that is no less true in the case of the surveillance conducted by CHAOS agents than it is of the eavesdropping performed by NSA computers.

58. It bears noting in this connection that few if any national governments besides our own are inclined to establish official commissions of inquiry into the activities of their intelligence agencies, or to make public the results of such inquiries. The fact that our government has chosen to make a relatively clean breast of its foreign and domestic intelligence activities' impact on individuals hardly supports an inference that other governments are anxious to have their roles in those activities similarly submitted to the scrutiny either of their citizens or of foreign interests.

59. Appellants suggest that the Director's claim of privilege as to the identities or identifying characteristics of informers is properly viewed as an instance of the "informer's privilege," *see United States v. Roviaro,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), rather than of the state secrets privilege, and so is only a claim of *qualified* privilege. For the reasons stated in text, we dismiss this contention. The fact that the informer's privilege might be applicable *in addition* to that for state secrets is irrelevant to the consideration of the latter privilege.

60. As discussed in Part I, *supra,* CHAOS agents and other informants frequently posed as members of domestic antiwar groups prior to taking up posts overseas.

61. *See* Turner Affidavit, ¶ 11, *quoted in* note 56 *supra.* Our quotation of the Fourth Circuit's characterization of the problem in *Halkin I,* 598 F.2d at 8–9, bears repetition:

The significance of one item of information may frequently depend upon knowledge of many other items of information. What may

■ Appellants argue that some of the matters apparently claimed to be privileged are in fact matters of public knowledge, and therefore that the privilege claim must be assumed to be overbroad and suspect. They point to the "extensive body of literature revealing such information in books by former CIA officials which have been screened and approved by the CIA prior to publication." [62] This published matter offers little support for the contention. In *Halkin I,* we held that "[t]he government is not estopped from concluding in one case that disclosure is permissible while in another case it is not." [63] We need not even go that far here. Particularly in view of the fact that disclosure of an overseas CIA station's *existence* is a far cry from disclosure of the *activities* carried on by that station (and whether they were carried on

with the knowledge, acquiescence, or active participation of local intelligence agencies),[64] we see no inconsistency in the CIA's position. We reject, as we have previously, the theory that "because *some* information about the project ostensibly is now in the public domain, *nothing* about the project in which the appellants have expressed an interest can properly remain classified" or otherwise privileged from disclosure. *Military Audit Project v. Casey,* 656 F.2d 724, 752 (D.C.Cir.1981); *cf. Hayden v. National Security Agency/Central Security Service,* 608 F.2d 1381, 1388 (D.C.Cir.1979) (prior release of material did not bar agency from asserting FOIA exemption).[65]

■ 2. Because we find the Director's public affidavit adequate to support the district court's decision to uphold the claim

---

**62.** Brief for Appellants at 52.

**63.** 598 F.2d at 9. *See Military Audit Project v. Casey,* 656 F.2d 724, 744- 45 (D.C.Cir.1981):

Whatever the truth may be, it remains either unrevealed or unconfirmed. We cannot assume, as the appellants would have us, that the CIA has nothing left to hide. To the contrary, the record before us suggests either that the CIA still has something to hide or that it wishes to hide from our adversaries the fact that it has nothing to hide.

(footnote omitted). *See also Hayden v. Nat'l Security Agcy./Central Security Svc.,* 608 F.2d 1381, 1388 (D.C.Cir.1979). While surely there are limits to this "reverse-psychology" analysis of the need for secrecy, those limits have not been tested in this case.

**64.** Under the Intelligence Identities Protection Act of 1982, Pub.L.No. 97 200, 96 Stat. 122 (June 23, 1982), *to be codified at* 50 U.S.C. §§ 421 -26, it is a defense to the felony offenses defined by that Act that "the United States had publicly acknowledged or revealed the intelligence relationship to the United States of the individual the disclosure of whose intelligence relationship to the United States is the basis for the prosecution." 50 U.S.C. § 422(a). Although the statute does not define the term "intelligence relationship," presumably the disclosures thereby exempted from the Act's coverage are those which do not exceed the scope

seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context. *United States v. Marchetti,* 466 F.2d 1309, 1318 (4th Cir.), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972).

of the facts "publicly acknowledged" by the government.

**65.** A final argument advanced by appellants is that the district court erred in not evaluating the Director's claim of privilege against the terms of Executive Order 12065, 3 C.F.R. 190 (1979). Appellants assert that this Order, governing the *classification* of government information, imposed upon intelligence officials the duty to "balance the public interest in disclosure against the harm to the national security" in determining not only whether to declassify classified information but also whether to claim the privilege for secrets of state. *See* E.O. 12065, § 3–303 (agency head must decide "whether the public interest in disclosure outweighs the damage to national security that might reasonably be expected from disclosure"). As appellants concede, this order went into effect *after* the Director asserted the privilege. The argument therefore requires as a threshold matter that the court conclude *both* that the Executive Order governing classification also governs assertions of the state secrets privilege *and* that the courts should make reference to the order in effect at the time the claim of privilege is ruled upon rather than at the time it is made. We find it unnecessary to express an opinion on either issue. Executive Order 12065 has been superseded, effective August 1, 1982, by Executive Order 12356, signed by President Reagan on April 2, 1982. The new Order omits the "balancing" standard urged by appellants. *See* E.O. 12356, Part 3. Therefore, the district court's failure to require a showing that the Director had "balanced" the interests prior to claiming the privilege was at most harmless error.

of privilege we need not reach appellants' contentions regarding the *in camera* affidavit. Specifically, we need not consider appellants' claim that the court should have required a more complete articulation of the Director's claim on the public record in order to permit full adversary development of the issue of its adequacy. *Compare Philippi v. CIA,* 546 F.2d 1009, 1013 (D.C.Cir. 1976) (requiring fuller public submissions) *with Military Audit Project v. Casey,* 656 F.2d 724, 751 (D.C.Cir.1981) ("In national security cases, some sacrifice to the ideals of the full adversary process are inevitable."); *Hayden,* 608 F.2d at 1387–88; *and Halkin I,* 598 F.2d at 7. Appellants offer no reasons to suspect the Director's public affidavit of bad faith or inaccuracy. *Cf. Allen v. Central Intelligence Agency,* 636 F.2d 1287, 1298 (D.C.Cir.1980) (FOIA suit). Therefore, although the claim of privilege could in this instance have been upheld without reference to the *in camera* affidavit, the district court was free to satisfy itself of the credibility of the public affidavit by resort to the *in camera* submission. *Cf. Salisbury v. United States,* 690 F.2d 966 at 973–974 n. 3, (D.C.Cir.1982) (examination in FOIA action of *in camera* affidavit where public affidavit was adequate to support claim of Exemption 1).

3. Appellants are of the view that a claim of the state secrets privilege with respect to *documents* must be justified in accordance with the same procedures and the same ultimate burdens that obtain in cases seeking disclosure under the Freedom of Information Act. They contend that the refusal of the CIA to produce CHAOS documents or more fully to explain the redactions made in those which were produced violated these requirements. We disagree.

Appellants contend that the withholdings and deletions here should have been justified by a showing of the type required in FOIA cases by *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

*Vaughn* mandates that government agencies claiming one or more of the statutory exemptions from the FOIA submit "a relatively detailed analysis in manageable segments" that "correlate[s] statements made in the Government's refusal justification with the actual portions of the document" sought to be withheld. 484 F.2d at 826–27 (footnote omitted). The customary means of complying with this mandate has been for the government to submit a "*Vaughn* index" itemizing each instance of claimed exemption, describing the document involved, and stating the specific exemption(s) asserted to apply. The index may be supplemented with representative exhibits illustrating the nature of the documents and the context of redactions made, and in some cases with *in camera* submissions which make evident the need for confidentiality.

█ We take note at the outset of the substantial effort already made by the Director in the case to provide the kind of specific explanation contemplated by *Vaughn* and its progeny. As stated above, the redactions made in documents provided in response to plaintiffs' request were usually accompanied by coded explanations indicating the type of information deleted.[66] The district court specifically found, in accordance with the language of *Reynolds,* that further explanation of the reasons for withholding information "is not required, *nor is it by and large possible, in the context of the present suit.*"[67] We agree with appellees and the district court that further justification was not called for.

█ First, the discovery sought here takes place in a context different from the statutory system of mandatory disclosure established by FOIA. Although the scope of civil discovery may well exceed the scope of FOIA-mandated disclosure in some instances, the *nature of the decision* to withhold information in the case of a claim of the state secrets privilege fundamentally differs from the decision to claim a FOIA

---

**66.** *See* note 26 *supra.*

**67.** J.A. at 593.

exemption. The most important difference is that the claim of the state secrets privilege is a decision of *policy* made at the *highest level* of the executive branch after consideration of the facts of the *particular case.* The *Reynolds* requirements compel that it fulfill these requisites. Consequently, the risk of permitting relatively unaccountable "invisible" bureaucratic decisions as to the national security value of information (specifically, the decisions to classify information that trigger FOIA Exemption 1 [68]) to bar disclosure of information on a wholesale basis is not presented in a state secrets case.[69]

Second, the unique status of national security information under *both* FOIA and general civil discovery practice militates against requiring broader disclosure here. In their zeal to impose the requirements of *Vaughn* indexing beyond the FOIA context, appellants largely ignore the purposes *Vaughn* itself sought to serve.

█ A *Vaughn*-type index of the withheld documents and redactions involved here would in fact serve little purpose. The *raison d'etre* of the *Vaughn* index is to permit a fuller adversarial examination of the justifications for withholding information which is presumed by statute to be available to the public. In cases where there is frequently doubt as to whether documents meet the threshold requirements of the asserted exemption—*e.g.,* the "investigatory record compiled for a law enforce-

ment purpose" threshold of Exemption 7 or the "medical or personnel files or similar files" threshold of Exemption 6 [70]—the *Vaughn* index permits the court, with the assistance of the requesting party, to determine whether the information qualifies for exemption. However, *as Vaughn itself recognized,* where the only question is whether information has been deemed by the executive to be so sensitive as to pose a risk to national security were it disclosed, a more detailed statement of the characteristics of the withheld information would serve no useful end. The executive's resolution of the issue in favor of secrecy *terminates the inquiry under FOIA* just as it does under the state secrets privilege. *See Vaughn,* 484 F.2d at 824.

The innovation in *Vaughn* of the indexing requirement that now bears its name was, as that opinion will show, a response to cases *other than* those in which an actual executive determination of the need for secrecy had been demonstrated. *Id.* In this case, the information is of a sort "the factual nature of which was not disputed." *Id.* Consequently, the rationale in *Vaughn* for imposing an indexing-and-explanation requirement—that the documents sought "do not indisputably fit within one of the exemptions to the FOIA," *id.*—has no application to the information in the case at bar. In short, appellants argue for the expansion of the procedure that has no bearing in the first place on this case.[71] The district court

---

**68.** Exemption 1, 5 U.S.C. § 552(b)(1) (1976), exempts matters that are "(A) specifically authorized under criteria established by Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."

**69.** It bears noting that the state secrets privilege applies regardless of whether the information has actually been classified pursuant to the substantive and procedural requirements of applicable statutes or executive orders. *See, e.g., ACLU v. Brown,* 619 F.2d 1170 (7th Cir. 1980) (en banc) (state secrets privilege is valid defense to FOIA action independently of statutory exemptions). Although matter qualifying as a secret of state will presumably always qualify for classified status, the privilege operates on premises, rooted in the careful consideration by

an executive officer in a policymaking role, entirely different from those governing the routine classification of information by lesser officials.

**70.** *See* 5 U.S.C. § 552(b)(6) & (7) (1976).

**71.** This court's holding in *Dellums v. Powell,* 642 F.2d 1351 (D.C.Cir.1980), is not to the contrary. That case presented the question whether a detailed *Vaughn* index could be required to justify a claim of *executive* privilege made in response to civil discovery requests for production of presidential tape recordings. Critical to our affirmative answer there was the fact that the executive privilege asserted is a *qualified* one, requiring a transcript-by-transcript *balancing* of the interest in disclosure against the need for secrecy. *See id.* at 1363. As we have noted above, the state secrets privilege, being

was on solid ground in refusing to compel production of documents on the basis of the Director's claim as asserted in the public affidavit without resort to any more detailed justification.

## B. Availability of Relief

### 1. Watchlisting

In *Halkin I,* we held that because the state secrets privilege barred proof of the fact that particular communications were intercepted by NSA, the district court could properly dismiss claims against the *NSA* defendants [72] based on the *acquisition* of plaintiffs' international communications. We are now presented with the related but not identical question whether the district court could also properly dismiss the claims for injunctive and declaratory relief against the *CIA* defendants based upon their *submission of plaintiffs' names* on "watchlists" to NSA.[73] Because we conclude that appellants are at present incapable of demonstrating that they have standing to challenge that practice, we affirm the district court's judgment.

The district court was of the view that as a result of the state secrets privilege holding in *Halkin I* regarding NSA interceptions, "plaintiffs cannot show any injury from having their names submitted to NSA because NSA is prohibited from disclosing whether it acquired any of plaintiffs' communications." Since a showing of "present or imminent future injury" was a "basic precept" of the relief sought, the court entered summary judgment for defendants on the claims for injunctive and declaratory

relief with respect to future submission of watchlists to NSA by the agencies concerned with foreign intelligence.[74]

Appellants argue that this judgment was error. They contend that *the very fact of submission* of names to NSA, as to which no claim of state secrets privilege has ever been made, "creates a sufficient threat of injury to warrant injunctive or at least declaratory relief enforcing Fourth Amendment protections" even in the absence of proof that the submissions actually resulted in the acquisition of communications to or from the named subjects.[75] A contrary ruling, it is argued, would create a dangerous variant of the "silver platter" doctrine [76] by permitting intelligence officials to insulate surveillance undertaken by others at their direction (*i.e.,* as a result of their submission of names to. NSA) from fourth amendment scrutiny.

Before considering the merits of this position, it is necessary to define precisely the nature of appellants' argument. That argument proceeds as follows: *if* the warrantless interception of a plaintiff's communications would violate the fourth amendment, *then* watchlisting—which creates a substantial threat of such interception—would also violate the fourth amendment, just as the use of "silver platter" evidence by *federal prosecutors does by encouraging* unlawful searches and seizures by state officers.

The flaw in the argument is not in the validity of the if-then inference, but in the soundness of its premise. Manifestly, watchlisting *by itself* would never be a

---

absolute, requires no such balancing. Once the court is satisfied as to the nature of the information withheld, the inquiry is at an end.

**72.** The interception claims were directed primarily at obtaining monetary relief from NSA officials in their individual capacities; however, plaintiffs also sought equitable relief against the NSA.

**73.** Appellants concede that *Halkin I* bars the awarding of money damages against the individual CIA defendants for watchlisting. Brief for Appellants at 6 n.**.

**74.** *See* J.A. at 766.

**75.** Brief for Appellants at 49.

**76.** The "silver platter" doctrine held that the fourth amendment exclusionary rule of *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), barring use of unlawfully seized evidence in federal court, applied only to evidence seized by federal agents and therefore did not bar the use in a federal prosecution of evidence seized in the same fashion by state officers. The doctrine was repudiated in *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

fourth amendment violation: the mere forwarding of a name by one agency to another involves no "search" or "seizure" triggering the constitutional limitation. Only the fact that the act of forwarding the name might *lead to* an *unlawful* search or seizure could make watchlisting constitutionally suspect. While appellants argue strenuously that watchlisting *leads to* interception, they fail to establish the critical second half of the premise, *i.e.*, that the resulting interception would be *unlawful*. In short, the "if" underlying their argument—if interception would violate their fourth amendment rights, then watchlisting would do so also—is nowhere proved.

Nor *can it be* proved. Our ruling in *Halkin I* is controlling on the point that the presence of one's name on a watchlist cannot be presumed to establish that interceptions of one's communications have occurred. Since it is the constitutionality of such interceptions that is the ultimate issue, the impossibility of proving that interception of any appellant's communications ever occurred renders the inquiry pointless from the outset. The district court was therefore correct in applying *Halkin I* to the watchlisting claims against the CIA defendants.[77]

In holding that *Halkin I* concluded the watchlisting claims against the plaintiffs, the district court viewed the matter as one concerning the law of remedies: whether the inability to demonstrate the fact of acquisition barred an award of injunctive or declaratory relief against future submissions of names. While we do not disagree with this approach to the problem, we agree with appellees that a more serious flaw in appellants' claims for such relief is the problem of justiciability they present.[78] We hold that appellants' inability to adduce proof of actual acquisition of their communications now prevents them from stating a claim cognizable in the federal courts. In particular, we find appellants incapable of making the showing necessary to establish their standing to seek relief.

In *Harrington v. Bush,* 553 F.2d 190 (D.C. Cir.1977), this court discussed at length the constitutional requirement of standing.[79] We stated:

The first, and primary inquiry, concerns the existence of "injury in fact, economic or otherwise," . . . This requirement is the irreducible constitutional minimum which must be present in every case. If the court finds that there is no injury in

---

**77.** *Compare Jabara v. Kelley,* 476 F.Supp. 561 (E.D.Mich.1979), *appeal pending* No. 80–1391 (6th Cir.) (submitted March 3, 1982). There, the court found that the fourth amendment was violated where the evidence showed that the FBI *had submitted* plaintiff's name on a watchlist to NSA and NSA had supplied the FBI with summaries of plaintiff's foreign wire communications it *had intercepted.* The court was at pains to distinguish its ruling from our opinion in *Halkin I,* on the specific ground that "[i]n this case, that threshold and ultimate issue [the fact of interception] *is an admitted fact." Id.* at 578. The unavailability of other facts as to which a claim of the state secrets privilege had been upheld thus did not, as it does in this case, prevent plaintiff from going forward on his constitutional claims. *Compare also Sigler v. LeVan,* 485 F.Supp. 185, 199 (D.Md.1980) (although privilege upheld, claim might still be established) *and Clift v. United States,* 597 F.2d 826, 830 (2d Cir. 1979) (same) *with Farnsworth Cannon, Inc. v. Grimes,* 635 F.2d 268, 281 (4th Cir. 1980) (en banc) (where claim would not be established without disclosure of privileged matter, dismissal proper) *and Kinoy v. Mitchell,* 67 F.R.D. 1, 9 n. 27 (S.D.N.Y.1975) (same).

**78.** The dichotomy between a party's standing and the availability of the relief he seeks is concededly not a rigid one. It is not by coincidence that "the most acute questions of standing characteristically arise in proceedings for an injunction or for a declaratory judgment . . . attacking the constitutionality of official action . . . ." P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 156–57 (2d ed. 1973). *See Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–2205, 45 L.Ed.2d 343 (1975). The critical fact here is that appellants cannot demonstrate *any* injury—past, present, or future—in connection with watchlisting.

**79.** Although *Harrington* concerned the standing of a member of Congress to challenge allegedly unlawful practices of the CIA, we noted that "[a]lthough the interests and injuries which legislators assert are surely different from those put forth by other litigants, the technique for analyzing the interests is the same." 553 F.2d at 190.

fact, "no other inquiry is relevant to consideration of standing."

553 F.2d at 205 n.68 (citations omitted).

▮ The standing issue is now ripe for our consideration. "Although standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings, it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 115 n.31, 99 S.Ct. 1601, 1615 n.31, 60 L.Ed.2d 66 (1979). *See Steffel v. Thompson,* 415 U.S. 452, 459 n.10, 94 S.Ct. 1209, 1215 n.10, 39 L.Ed.2d 505 (1974); *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 718 n.22 (D.C.Cir.1977). In the present case, there can be little doubt that the complaint *alleged* facts—interception of plaintiffs' private communications—which if proved would constitute an injury in fact, permitting plaintiffs to go forward in an effort to prove the truth of those allegations and any consequent liability of the defendants. *United States v. American Telephone & Telegraph,* 642 F.2d 1285, 1291 (D.C.Cir.1980). The sufficiency of those allegations must, however, be reevaluated in view of our ruling in *Halkin I* that *evidence of the fact of acquisition of plaintiffs' com-*munications by NSA cannot be obtained from the government, *nor can such fact be presumed* from the submission of watchlists to that Agency. In this situation, it can only be concluded that appellants are incapable of demonstrating that they have sustained a violation of their fourth amendment rights. That conclusion compels the finding that appellants are without standing to assert the watchlisting claims set forth in their complaint.

▮ Appellants have alleged, but *ultimately cannot show,* a concrete injury amounting to either a "specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972). Although the contours of the CIA activity giving rise to appellants' claims are spelled out in considerable detail in the record of this case and in the public reports on that activity, as we held in *Harrington v. Bush, supra,* a litigant is "required to allege that *he* has suffered some specific harm, not that the injury emanates from some specific source." 553 F.2d at 211 (emphasis added).[80] "It is the nature of the injury, and not the source, that is the primary focus of concern when dealing with the question of standing."[81] Consequently, the absence of

---

**80.** "[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify the exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–2205, 45 L.Ed.2d 343 (1975), *quoting Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) (emphasis in original).

**81.** *Id.* Even an allegation of very grave injury will be insufficient to establish standing if the injury cannot be shown to have been suffered *by the plaintiff.* "The question of standing 'focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated.'" *Reuss v. Balles,* 584 F.2d 461, 465 (D.C.Cir.1978), *cert. denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1979), *quoting Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Just as standing cannot be denied because of the relatively modest quantum of the injury, *see, e.g., Southern Mutual Help Ass'n, Inc. v. Califano,* 574 F.2d 518, 523 (D.C.Cir.1977); *An-*imal *Welfare Inst. v. Kreps,* 561 F.2d 1002, 1008 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978), it cannot be upheld merely on the basis of the importance of the injury alleged, *see, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Richardson v. Miller,* 504 F.Supp. 1039, 1043 (W.D.Pa.1980).

Although exceptions to this rule are recognized in those rare instances in which litigants are permitted to assert the constitutional rights of third parties, in such cases the constitutional issues presented are typically *facial* constitutional challenges capable of resolution without any significant development of a factual record. *See, e.g., Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); *Nat'l Conference of Catholic Bishops v. Smith,* 653 F.2d 535, 543 (D.C.Cir.1981) (appendix). *See generally Martin Tractor Co. v. Federal Election Comm.,* 627 F.2d 375 (D.C.Cir.1980) (discussing

proof of actual acquisition of appellants' communications is fatal to their watchlisting claims.

In terminating appellants' action on grounds that may make it extremely difficult ever to pursue similar claims, it is important to stress the dimensions of the question appellants ask us to resolve in passing on the constitutional status of watchlisting. The constitutionality of warrantless electronic surveillance of United States citizens in connection with foreign intelligence operations is a question that has been specifically reserved for decision by the Supreme Court. *United States v. United States District Court,* 407 U.S. 297, 308, 321–22, 92 S.Ct. 2125, 2132, 2138–2139, 32 L.Ed.2d 752 (1972).[82] Were we to permit appellants to litigate the merits of that question in the district court, the focus of the proceedings would necessarily be upon "the 'reasonableness' of the search and seizure in question, and the way in which that 'reasonableness' derives content and meaning through reference to the warrant clause." *Id.* at 309–10, 92 S.Ct. 2132–2133; *see id.* at 315, 92 S.Ct. at 2135. The valid claim of the state secrets privilege makes consideration of that question impossible. Without evidence of the detailed circumstances in which the CIA forwarded appellants' names to NSA, the contents of communications intercepted as a result (in particular, whether the communications were sent or received *by* appellants or simply mentioned them), the duration of the appellants' stays on the watchlists, and like matters—in short, "the essential information on

which the legality of executive action [in foreign intelligence surveillance] turns"[83] —it would be inappropriate to resolve the extremely difficult and important fourth amendment issue presented. Determining the reasonableness of warrantless foreign intelligence watchlisting under conditions of such informational poverty, armed only with the fact that the CIA at some point submitted a watchlist without obtaining a warrant, would be tantamount to the issuance of an advisory opinion on the question. *See Chagnon v. Bell,* 642 F.2d 1248, 1263 (D.C.Cir.1980) (dictum).

With no hope of a complete record and adversarial development of the issue, we cannot authorize such inquiry. The limits upon our consideration of such claims were stated by the Supreme Court in *Schlesinger v. Reservists Committee to Stop the War:*

> Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution. It adds the essential dimension of specificity to the dispute by requiring that the complaining party have suffered a particular injury caused by the action challenged as unlawful. This personal stake is what the Court has consistently held enables a complainant authoritatively to present to a court a complete perspective upon the adverse consequences flowing from the specific set of facts undergirding his grievance. Such authoritative presentations are an integral part of the judicial process, for a

"special status" of facial first amendment claims). In cases like the present one, the significance of the constitutional questions involved cannot obviate the need for proceeding upon a "full-bodied record." *Pub. Affairs Ass'n, Inc. v. Rickover,* 369 U.S. 111, 113, 82 S.Ct. 580, 582, 7 L.Ed.2d 604 (1962).

**82.** In *Zweibon v. Mitchell,* 516 F.2d 594 (D.C.Cir.1975) (en banc), a majority of the court were in agreement that the warrantless electronic surveillance within the United States of persons not suspected of any collaboration with foreign interests adverse to this country violates the fourth amendment. However, there was no opinion of the court on the question of warrantless surveillance of collabora-

tors or suspected collaborators of foreign interests. *See id.* at 681 (opinion of McGowan, J.) (not reaching constitutional question); *id.* at 688 (Robb, J.); *id.* at 689 (Wilkey, J.); *id.* at 706 (MacKinnon, J.). For decisions finding warrantless foreign intelligence surveillance lawful, *see, e.g., United States v. Truong Dinh Hung,* 629 F.2d 908 (4th Cir. 1980); *United States v. Buck,* 548 F.2d 871 (9th Cir. 1977); *United States v. Butenko,* 494 F.2d 593 (3d Cir. 1974) (en banc); *United States v. Brown,* 484 F.2d 418 (5th Cir. 1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974).

**83.** *United States v. Brown,* 484 F.2d 418, 427 (5th Cir. 1973) (Goldberg, J., concurring).

court must rely on the parties' treatment of the facts and claims before it to develop its rules of law. Only concrete injury presents the factual context within which a court, aided by parties who argue within the context, is capable of making decisions.

Moreover, when a court is asked to undertake constitutional adjudication, the most important and delicate of its responsibilities, the requirement of concrete injury further serves the function of insuring that such adjudication does not take place unnecessarily. This principle is particularly applicable here, where respondents seek an interpretation of a constitutional provision which has never before been construed by the federal courts. 418 U.S. 208, 221–22, 94 S.Ct. 2925, 2932–2933, 41 L.Ed.2d 706. Because here, as in *Schlesinger,* "it can only be a matter of speculation whether the claimed violation has caused concrete injury to the particular complainant[s]," *id.* at 223, 94 S.Ct. at 2933, appellants' watchlisting claims were properly dismissed. Although "[u]nder this analysis there may indeed be illegal or unconstitutional actions which will go unchallenged *in a federal court* due to the lack of a proper party to [bring suit]," [84] that is the result required here.

■ As in the other cases in which the need to protect sensitive information affecting the national security clashes with fundamental constitutional rights of individuals, we believe that "[t]he responsibility must be where the power is." *New York Times Co. v. United States,* 403 U.S. 713, 728, 91 S.Ct. 2140, 2148, 29 L.Ed.2d 822 (1971) (Stewart, J., concurring). In the present context, where the Constitution compels the subordination of appellants' interest in the pursuit of their claims to the executive's duty to preserve our national security, this means that remedies for constitutional violations that cannot be proven under existing legal standards, if there are to be such remedies, must be provided by Congress.[85] That is where the government's power to remedy wrongs is ultimately reposed. Consequently, that is where the responsibility for compensating those injured in the course of pursuing the ends of state must lie. *United States v. Richardson,* 418 U.S. 166, 179, 94 S.Ct. 2940, 2947, 41 L.Ed.2d 678 (1974).

### 2. *Executive Orders 12036 and 12333*

■ Appellants also sought declaratory and injunctive relief directed at foreign intelligence activity under Executive Order 12036, 3 C.F.R. 190 (1979). The district court rejected that claim on the basis of the fact that the plaintiffs "have not alleged injury or the threat of injury by surveillance undertaken pursuant to the Executive Order," [86] and so lacked standing to attack that Order. Although that Order has been superseded by E.O. 12333 (1982), appellants suggest in their reply brief that since the more recent Order if anything permits expansion of the scope of foreign intelligence activity, their arguments should be considered notwithstanding the change in the nature of the beast they attack.[87]

The result reached by the district court was clearly the proper one. For still more clearly than in the case of watchlisting, it is apparent that appellants here urge nothing

---

**84.** *Harrington v. Bush,* 553 F.2d at 197 n. 31 (emphasis in original).

**85.** Of course, Congress cannot create standing where none exists under the Constitution. *See generally Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

**86.** J.A. at 768 n. 5.

**87.** Some question might be presented with respect to the mootness of appellants' claim in this respect. Appellants suggest that the "evanescent nature of Executive Orders," which are promulgated and withdrawn at the will of the President, makes it possible that by the time appellate review of the terms of such orders as those under consideration here can be had, those terms will be a dead letter. In fact, there have been three different Executive Orders governing foreign intelligence gathering in effect during the time spanned by this litigation. *See* E.O. 11652, 3 C.F.R. 678 (1976) (President Nixon); E.O. 12036, 3 C.F.R. 190 (1979) (President Carter); E.O. 12333 (1982) (President Reagan). We assume for present purposes, without deciding, that appellants' arguments with respect to E.O. 12036 may be considered as applying to the new order.

more than a "generalized grievance" [88] against the intelligence-gathering methods sanctioned by the President. *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 220–21, 94 S.Ct. 2925, 2931–2932, 41 L.Ed.2d 706. There is no allegation that *any* intelligence has been or is about to be gathered via the means allegedly permitted under the current order, much less an allegation of an injury in fact of any immediacy to any appellant.

This claim is squarely controlled by *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). There, plaintiffs claimed that the mere existence of any Army program to gather intelligence on domestic civil disorders resulted in a "chilling" of their first amendment rights of speech, association and petition—precisely the injury asserted to arise in this case under the Executive Order.[89] Reversing a decision of this court which held the plaintiffs entitled to pursue their claim, the Supreme Court ordered the action dismissed as nonjusticiable.

**88.** *Flast v. Cohen,* 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed.2d 947 (1968).

**89.** In connection with this claim, appellants note that some of the appellants "are presently engaged in political activities which are in opposition to current United States foreign policies and which bring them in contact with foreign organizations and individuals." J.A. at 692, *cited in* Brief for Appellants at 41. The claimed injury is that appellants will be deterred from continuing such lawful activity by the current Executive Order, which they assert renders them likely targets of surveillance. Brief for Appellants at 41.

**90.** Stripped to its essentials, what respondents appear to be seeking is a broad-scale investigation, conducted by themselves as private parties armed with the subpoena power of a federal district court and the power of cross-examination, to probe into the Army's intelligence gathering activities, with the district court determining at the conclusion of that investigation the extent to which those activities may or may not be appropriate to the Army's mission. . . .

Carried to its logical end, this approach would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; such a role is appropriate for the Congress acting through its committees and the "power of the purse"; it is not the role of the judiciary, absent actual present or immediately threatened in-

Appellants' claim here, like those at issue in *Laird,* "is that they disagree with the judgments made by the Executive Branch with respect to the type and amount of information [needed] . . . and that the very existence of the . . . data gathering system produces a constitutionally impermissible chilling effect upon the exercise of their First Amendment rights." 408 U.S. at 13, 92 S.Ct. at 2325. As the Court held there, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm. . . ." *Id.* at 13–14, 92 S.Ct. at 2325–2326.[90] *See also National Student Association v. Hershey,* 412 F.2d 1103 (D.C.Cir.1969).[91] The fact that appellants may have been subjected to surveillance under the policies of previous administrations cannot supply the missing causal link between that injury and the policies now under attack.

Since the first amendment claim asserted against the Executive Order must be dis-

jury resulting from unlawful governmental action.

We, of course, intimate no view with respect to the propriety or desirability, from a policy standpoint, of the challenged activities of the Department of the Army; our conclusion is a narrow one, namely, that on this record the respondents have not presented a case for resolution by the courts.

408 U.S. at 14–15, 92 S.Ct. at 2326–2327.

**91.** *Compare Jabara v. Kelley,* 476 F.Supp. 561, 568 (E.D.Mich.1979) (distinguishing *Laird* as an attack on "a general system of intelligence gathering"), *appeal pending,* No. 80-1391 (6th Cir.) (submitted March 11, 1982). The district court there pointed to several facts tending to show that the "chilling effect" of the surveillance involved was more than merely "subjective." However, these facts were all *demonstrated in the record*—they were actual fact, rather than speculations about the sorts of surveillance the FBI *might* undertake under current interpretations of its authority. In the present case, there is no credible claim that the instances of surveillance of plaintiffs that have been admitted by the CIA, all of which occurred prior to 1974, bear any relationship to the particular terms of the Executive Order(s) they now attack. Appellants' claim is therefore precisely the kind of generalized grievance barred from judicial consideration by *Laird.*

missed as nonjusticiable, it follows *a fortiori* that the fourth amendment challenge to the Order must likewise be dismissed. Although the fourth amendment has been read as furnishing either a coextensive or a narrower scope of protection for private political activity compared to that provided by the first,[92] it is apparent that the fourth amendment provides no *broader* protection counselling a more liberal reading of the injury-in-fact requirement than is appropriate in first amendment cases. Consequently, a failure of standing for failure to allege injury to one's first amendment rights is in the present context fatal to fourth amendment standing as well.

### 3. *CHAOS-type surveillance*

The district court rejected appellants' claims for injunctive and declaratory relief directed at Operation CHAOS and similar intelligence gathering activities on the ground that they were based upon merely "hypothetical or speculative harm which is insufficient to support the grant of declaratory or injunctive relief." [93] Appellants argue that this ruling, which resulted in a grant of summary judgment in favor of appellees as to the CHAOS claims, was erroneous because (1) under current executive policy (the Executive Order governing for-

eign intelligence activities) there continues to be a threat of unlawful CIA surveillance of domestic political activities, in which some appellants are still engaged; and (2) even if there is no basis for a permanent injunction against the CIA, a declaration that *past* surveillance under Operation CHAOS was unconstitutional does not depend upon any showing of present or threatened future harm and so should have been granted.

▆▆▆▆▆ Unlike their contentions based upon watchlisting or the general terms of Executive Orders 12036 and 12333, appellants' claims for injunctive and declaratory relief from Operation CHAOS or similar programs directed at discovering foreign influence upon domestic dissident activity are based upon demonstrated injury in fact. The CIA has conceded that various identified and unidentified plaintiffs here were subjected to surveillance under Operation CHAOS.[94] Therefore, it is evident that at least some of the appellants—the nine *identified* as subjects of CHAOS surveillance [95] —have standing in the constitutional sense to challenge the constitutionality of that surveillance and to seek appropriate relief upon proof of a violation of their rights.[96]

The factual basis of appellants' claims concerning the "gathering and compilation of nonpublic information" consists of a

**92.** For a discussion of this question, see *Reporters Comm. for Freedom of the Press v. American Telephone & Telegraph Co.*, 593 F.2d 1030, 1053 60 (D.C.Cir.1978) (opinion of Wilkey, J.). *See also Jabara v. Kelley*, 476 F.Supp. 561, 570- 75 (E.D.Mich.1979), *appeal pending*, No. 80 -1391 (6th Cir.) (submitted March 11, 1982).

**93.** J.A. at 767.

**94.** *See* note 28 *supra*. The mail opening claims referred to were settled between the parties and are not in issue on this appeal. *See* J.A. at 778.

**95.** Leonard Adams, Nina Adams, Brown, DeNike, Halkin, Halliwell, Leigh Kagan, Schechter, Committee of Concerned Asian Scholars.

**96.** Implicit in our analysis of the standing issue presented by the rather unique facts herein is the conclusion that claims asserted by plaintiffs whose very *identities* must remain undisclosed are beyond the scope of the federal judicial power. Absent the presence of an identifiable

party whose claim of injury can be evaluated on its particular facts, the contentions raised here are simply a request for an advisory opinion. In such circumstances, there is no prospect that an adjudication will produce an adjustment of rights between two adverse parties—a prerequisite to the exercise of our power under Article III. Although the situation is different from the watchlisting problem, in which the very *existence* of any person subjected to NSA surveillance at the instance of the Special Operations Group must remain an unknown, the result must be the same. Where there is no state of facts imaginable upon which the court could make a finding of concrete injury in fact to some identifiable person, the claim is but a "generalized grievance." not susceptible of federal judicial cognizance.

Even were we to hold that the claims of the unidentified plaintiffs were justiciable, moreover, it would still be necessary to dismiss their claims. As with any claim that the fourth amendment has been violated, the essence of appellants' claims is necessarily that the information gathering in question impinged upon a

number of redacted CHAOS documents[97] which fairly indicate that the nine identified appellants were the subjects of CHAOS information collection in varying degrees of intensity. These documents were segregated by appellants and filed under seal with the district court pursuant to an order of April 8, 1980 requiring plaintiffs to submit documents supporting their statement of

material facts as to which there exists no genuine dispute.[98] Although the bulk of the redacted documents by themselves provide no substantial basis for concluding that the information contained therein was not public information,[99] a number of them do provide a basis for arguing that the surveillance which produced their contents triggered fourth amendment protections.[100]

*justified expectation of privacy* in an unreasonable manner. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Failure to establish either the threshold invasion of privacy or the ultimate unreasonableness of the search or seizure in question is fatal to a showing of liability, and *a fortiori* to proof of entitlement to a remedy of any kind. Our holding as to the state secrets privilege, which necessarily prevents access to the details (identification of *liaison services and CIA methods of surveillance*) surrounding the challenged surveillances, renders the unidentified plaintiffs incapable of proving any first or fourth amendment violation, and consequently of showing themselves entitled to injunctive or declaratory relief.

First, there is simply no way of determining, in the absence of details sufficient to identify the plaintiffs, what the privacy expectations of *these individuals were and whether such were* reasonable under the circumstances. The universe of relationships, movements, and activities of persons, and the manner in which they were carried out, comprehended by the vague descriptions of the surveillances here at issue, is simply too broad to permit even a beginning. There is no evidence, nor *can there be* any evidence adduced consistently with our holding *on the state secrets privilege issue,* that would tend to indicate whether *any* expectation of privacy attached to the information or communications obtained by Operation CHAOS.

Second, assuming that appellants did have a justified expectation that the information gathered under CHAOS would remain private, it cannot be demonstrated that the disappointment of that expectation constituted an "unreasonable" search or seizure in any instance. There is no *per se* rule requiring that surveillance of United States persons for foreign intelligence purposes be conducted only upon prior *judicial* approval. *Zweibon v. Mitchell,* 516 F.2d 594 (D.C.Cir.1975) (en banc), which dealt only with foreign intelligence *wiretaps* of the sort now governed by the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. §§ 1801–1811, did not establish such a rule. Three of the eight judges participating expressed the view that the case presented the limited question of the constitutionality of warrantless wiretaps of persons concededly *not suspected of being foreign agents,* and one did not reach

the constitutional question. Therefore it would first have to be determined whether *the various* instances of surveillance involved were subject to prior judicial approval, or instead qualified as exceptions to the general presumption that a warrant is required, and if the latter, then whether the warrantless searches or seizures themselves were reasonable. *United States v. Truong Dinh Hung,* 629 F.2d 908, 916 (4th Cir. 1980). Neither determination is possible in the factual vacuum presented here. The notion of deciding either constitutional question—whether a warrant is required in certain foreign intelligence surveillances, and if not, whether certain activities are "reasonable"—on a record devoid of any details that might serve even to identify the alleged victim of a violation is ludicrous. It calls for the issuance of an opinion on a case in which the crucial facts are all necessarily hypothesized—the textbook example of a case falling without the federal judicial power. *See Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–464, 81 L.Ed. 617 (1937).

**97.** These include documents withheld in their entirety but whose existence and general nature are admitted by the CIA.

**98.** *See* District Court Rule 1–9(h). The documents were filed under seal in order to prevent disclosure of the information contained therein which plaintiffs claimed was nonpublic.

**99.** By "public information," we mean information as to which there can be no colorable claim of an expectation of privacy, *i.e.,* information the acquisition of which presents no fourth amendment concerns. While appellants' use may intend a substantially broader meaning—one encompassing information which is *in fact* not a matter of public knowledge at present even though its contents *could have* been readily gathered publicly at the time—we find it unnecessary to resolve the difference in meaning, since some of the information here meets our definition of "nonpublic."

**100.** For example, the documents provided by the CIA concerning appellant Committee of

Despite the sparse nature of these submissions, we cannot say that given these documented instances of CHAOS surveillance, plus whatever evidence appellants could adduce relating to the circumstances surrounding the subject activities, appellants are incapable as a matter of law of demonstrating at least a prima facie case of fourth amendment violations.[101] The question therefore reduces to one of the availability of the *remedies* to which appellants claim entitlement. The district court held that "plaintiffs' claims for injunctive and declaratory relief are not based on a cognizable danger of recurrent violation, only on the speculative possibility thereof,"[102] and therefore granted summary judgment in favor of defendants on those claims. We turn to the question of whether that judgment was an abuse of the district court's discretion.

(a) *Injunctive relief*

In our view the district court's decision to deny injunctive relief against the defendants was clearly in accord with established principles. Even assuming that appellants could make out a showing of liability on their fourth amendment or statutory claims, it would have been an abuse of discretion to enter an injunction restraining future foreign intelligence gathering operations conducted at the behest of the President. *See Laird v. Tatum,* 408 U.S. 1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972). There is nothing in the record that indicates appellants' ability to fulfill the traditional burden of proving the threat of imminent, specific and irreparable harm. *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974).

Appellants concede that Operation CHAOS was terminated nearly a decade ago. It cannot escape judicial notice that the United States has in the intervening years experienced no domestic political strife approaching the magnitude of that which prompted two Presidents to seek the information which Operation CHAOS was designed to provide. Congressional response to the revelation of CHAOS and similar intelligence gathering activities has also altered the context in which appellants' arguments are made—a principal example being the enactment of the Foreign Intelligence Surveillance Act of 1978.[103]

Although past surveillance gives the nine identified appellants standing to complain of injury, past injury alone is not sufficient to merit the award of relief against future conduct. A great deal more is required, particularly when the relief sought would broadly enjoin the conduct of vital governmental functions which require the exercise of discretion in a myriad of unpredictable circumstances.[104] "[J]udicial intervention to prevent potential injury from prospective government misconduct is only justified when such misconduct is imminent, not merely hypothetical." *Exxon Corp. v. FTC,* 589 F.2d 582, 589 n. 14 (D.C. Cir.1978) (citing cases), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979). To be entitled to invoke the injunctive remedy, a plaintiff must show "not only that *he personally* faces an *imminent*

---

Concerned Asian Scholars disclose, even in redacted form, information on the movements, activities, and communications of members of that organization that may well have been known only to the persons involved. These include the subjects discussed at a "Friday night meeting at the YWCA" and observations made by Committee representatives in the course of a trip to Communist China. The means by which this information was obtained—whether electronic or otherwise—are not disclosed. It is therefore possible that a justified expectation of privacy attached to at least some of the matters included in these documents, and that this information was collected by unreasonable means.

**101.** The same is true with respect to claims based upon the National Security Act of 1947, 50 U.S.C. § 403 (1976).

**102.** J.A. at 768.

**103.** Pub.L.No. 95–511, 92 Stat. 1783 (1978), *codified at* 50 U.S.C. § 1801–1811.

**104.** *See Laird v. Tatum,* 408 U.S. 1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972); *United States v. Butenko,* 494 F.2d 593, 605 (3d Cir. 1974) (en banc).

*threat of harm* but also that the threatened harm *is irreparable.*" *Reporters' Committee for Freedom of the Press v. American Telephone & Telegraph,* 593 F.2d 1030, 1067 (D.C.Cir.1978) (emphasis in original); *see also id.* at 1075 (Robinson, J., concurring). *See generally id.* at 1067–70. In short, "[t]he mere possibility of future misconduct is simply not enough." *Id.* at 1069.

■ Appellants' allegation to the effect that six of their number are still engaged in active opposition to prevailing United States foreign policy, and are therefore more likely (than, presumably, citizens in general) to be subject to unlawful government surveillance aimed at domestic dissidents [105] adds nothing to their case. The fact that an individual is more likely than a member of the population at large to suffer a hypothesized injury, while perhaps lending support to his *standing* to complain, makes the injury no less hypothetical.

Appellants' principal argument against the district court's denial of injunctive relief appears to assume that the district court premised its judgment on the view that their claim was moot.[106] They consequently direct their attack against that premise. We think appellants' focus is misleading in this regard, as it seeks to confuse the doctrine of *mootness* in the context of injunction proceedings, which goes to the *justiciability* of the underlying claim, with the *substantive* principles governing the grant of equitable relief.

Appellants place primary emphasis on the rule of *United States v. W. T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), which held that the burden is upon the *defendant* to show that a claim for injunctive relief has become moot in the Article III sense. But that opinion belies

the conclusion that mootness was its sole concern; the Court was concerned with the requirements of equity as well as with those of the Constitution. It drew the distinction explicitly:

Along with its power to *hear the case,* the court's power to *grant injunctive relief* survives discontinuance of the illegal conduct. . . . But the moving party must satisfy the court that relief is needed.

*Id.* at 633, 73 S.Ct. at 897 (emphasis added). Thus, while the burden is (as appellants contend) upon the defendant to show that a claim for injunctive relief has become *moot,* it lies with the plaintiff to show entitlement to the *remedy.*

Even were we to agree that the termination of Operation CHAOS did not render the case moot in the Article III sense of that term, then, that would not dispose of the issue of whether coercive relief was mandated here.[107] For the reasons set forth by Judge Wilkey in *Reporters Committee for Freedom of the Press, supra,* we affirm the district judge's exercise of her equitable discretion here.

#### (b) *Declaratory relief*

Our conclusions with respect to appellants' claims for injunctive relief—that while they are justiciable, they were correctly denied as a matter of equitable discretion—do not dispose of these issues as they are presented by appellants' claims for a declaration of the unlawfulness of CHAOS-type programs. The district court had the obligation "to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunc-

---

**105.** *See* note 89 *supra.*

**106.** Brief for Appellants at 41–44.

**107.** Our holding *infra* that appellants' claim for declaratory relief must fail for mootness suggests that were the mootness of the claim for an injunction considered at length, it would likewise result in dismissal. In the typical case, claims for injunctive relief will tend to

become moot before claims for a declaratory judgment. *See, e.g., Super Tire Eng'r Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974). Since we are of the view that appellants are in any event clearly barred by the requirements of equitable remedial doctrine from obtaining injunctive relief here, it is unnecessary to discuss the mootness question with respect to the injunction sought here.

tion." *Zwickler v. Koota,* 389 U.S. 241, 254, 88 S.Ct. 391, 398, 19 L.Ed.2d 444 (1967).[108]

█ The essence of the declaratory remedy [109] is affording a form of relief, on the basis of acts either completed or threatened, which will operate to adjust the rights of the parties in cases where the award of a prospective coercive judgment would, for any of a number of reasons, be inappropriate.[110] Thus it is the case, in contrast to the injunctive remedy, that a declaratory judgment may be appropriate even in a case where, due to a change of circumstances in the interval between the complained-of injury (or threat of injury) and the prayer for relief, there is no showing of a likelihood of imminent future harm or of the irreparable nature of the threatened injury.[111] Particularly where the parties are involved in an ongoing relationship that may present the opportunity for future disagreement—contracts of insurance being perhaps the classic example [112]—an adjudication may be appropriate.[113]

The foregoing considerations are, however, always subject to the minimum requirement of Article III. *Poe v. Ullman,* 367 U.S. 497, 506, 81 S.Ct. 1752, 1757, 6 L.Ed.2d 989 (1961). As a result, notwithstanding the independent stature and comparatively broad discretionary availability [114] of declaratory relief in the jurisprudence of federal remedies, nor the ability of appellants to demonstrate "injury in fact" here, the constitutional as well as statutory confinement of the federal judicial power in actions for declaratory relief to cases of "actual controversy" requires that attention be paid to the relationship of the parties as it subsists at the time it comes before us. *Steffel v. Thompson,* 415 U.S. 452, 460, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974); *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969).[115]

Appellants contend that although both Operation CHAOS and the domestic unrest associated with the Vietnam era have ceased, the fact that the executive branch has not renounced all claims of power under the Constitution to conduct CHAOS-type programs in the future compels the conclusion that a live controversy still exists. This argument confuses the injury-in-fact requirement necessary to *standing* with the "liveness" showing necessary to avoid a dis-

---

**108.** *See Super Tire Eng'r Co. v. McCorkle,* 416 U.S. 115, 121, 94 S.Ct. 1694, 1697, 40 L.Ed.2d 1 (1974). The differences between the two forms of relief are articulated in some detail, although in a context involving federalism concerns not present here, in *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). The Court of Appeals in that case had affirmed the dismissal of a complaint for injunctive and declaratory relief from a local ordinance prohibiting the distribution of handbills at a private shopping center, holding that the standard governing both forms of relief required a demonstration of irreparable injury. *Id.* at 462–63, 94 S.Ct. at 1217–1218. A unanimous Supreme Court reversed, ruling that under the circumstances, "the court erred in treating the requests for injunctive and declaratory relief as a single issue." *Id.* at 463, 94 S.Ct. at 1218.

**109.** The declaratory judgment remedy is created in 28 U.S.C. § 2201 (1976).

**110.** *See generally id;* C. Wright & A. Miller, Federal Practice and Procedure §§ 2751–2765 (1973).

**111.** *Perez v. Ledesma,* 401 U.S. 82, 123, 91 S.Ct. 674, 696, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring and dissenting).

**112.** *See* C. Wright & A. Miller, Federal Practice and Procedure § 2760 (1973). *See also Gautreaux v. Romney,* 448 F.2d 731 (7th Cir. 1971) (federal housing program).

**113.** *See Bituminous Coal Operators' Ass'n v. UMW,* 585 F.2d 586, 599 (3d Cir. 1978) (declaratory relief appropriate except where change of circumstances has made rights and obligations existing between the parties "so different . . . that the parties could derive no judgment preclusion benefit from an adjudication based upon past conduct").

**114.** *See, e.g., id.*

**115.** The district court's citation of *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941) evidences its consideration of this constraint. That case establishes the rule that even actions for declaratory judgment must satisfy the Art. III case-or-controversy requirement. *Super Tire Eng'r Co. v. McCorkle,* 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974); *Steffel v. Thompson,* 415 U.S. 452, 460, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974).

missal for mootness. Both are constitutional conditions on the exercise of federal court jurisdiction. Thus, appellants' assertion that here "the necessary case or controversy exists because defendants' actions have affected plaintiffs adversely"[116] demonstrates only a necessary, not a sufficient, condition for maintaining their action.

The controlling authority on the question of mootness in cases where declaratory relief is sought is *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974).[117] There an employer whose employees had gone out on strike after the expiration of a collective bargaining contract brought suit seeking injunctive and declaratory relief against the enforcement of state welfare laws which made the striking employees eligible for public assistance payments. The state programs were alleged to violate federal labor policy and the policies of the Social Security Act. When the strike ended before the district court could consider the claims for declaratory and permanent injunctive relief, the court dismissed the complaint as moot. The Court of Appeals affirmed.

The Supreme Court reversed, holding that while the prayer for an injunction was mooted by the employees' return to work, *id.* at 121–22, 94 S.Ct. at 1697–1698, the request for declaratory relief remained viable. The parties, the Court held, "may still retain sufficient interests and injury as to justify the award of declaratory relief." *Id.* at 122, 94 S.Ct. at 1698.

Although the result in *Super Tire* was in favor of federal jurisdiction, critical to the Court's determination that the case for declaratory relief was not moot was the finding that the challenged public assistance programs constituted a government policy which was "fixed and definite," *id.* at 124, 94 S.Ct. at 1699, and so not likely to be frequently altered by the executive depending on changing economic circumstances. Justice Brennan, in writing for the Court,

*distinguished* cases in which the injury asserted took effect only upon the exercise of the responsible government official's discretion. Discussing two prior decisions in which the Court had ruled actions by employers moot,[118] he stated:

> The governmental action challenged [in those cases] was the authority to seize the public utility, and it was clear that a seizure would not recur except in circumstances where (a) there was another strike or stoppage, and (b) in the judgment of the Governor, the public interest required it. The question was thus posed in a situation where the threat of governmental action was two steps removed from reality. This made the recurrence of a seizure so remote and speculative that there was no tangible prejudice to the existing interests of the parties and, therefore, there was a "want of a subject matter" on which any judgment of this Court could operate. *Oil Workers,* 361 U.S., at 371 [80 S.Ct., at 396].

*Id.* 416 U.S. at 123, 94 S.Ct. at 1698. Turning to the facts of *Super Tire,* it was observed that

> The present case has a decidedly different posture. As in *Harris* and *Oil Workers,* the strike here was settled before the litigation reached this Court. But, unlike those cases, the challenged governmental action has not ceased. The New Jersey governmental action does not rest on the distant contingencies of another strike and the discretionary act of an official. Rather, New Jersey has declared positively that able-bodied striking workers who are engaged, individually and collectively, in an economic dispute with their employer are eligible for economic benefits. This policy is fixed and definite. It is not contingent upon executive discretion.

*Id.* at 123–24, 94 S.Ct. at 1698–1699.

■ The Court's resolution of the mootness question in *Super Tire* rested, there-

---

116. Brief for Appellants at 46.

117. Indeed, *appellants* argue that *Super Tire* governs the instant case.

118. *Oil Workers Unions v. Missouri,* 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960); *Harris v. Battle,* 348 U.S. 803, 75 S.Ct. 34, 99 L.Ed. 634 (1954).

fore, on its finding that the governmental policy challenged in the original complaint was one essentially carved in stone and self-executing in nature—in short, one "not contingent upon executive discretion."[119] It was crucial to the result that the source of complaint was "a fixed policy directive" of the government.[120] By contrast, even if the current status of executive thinking on foreign intelligence gathering, as manifest in Executive Order 12333, constituted a "continuing and brooding presence, cast[ing] what may well be a substantial adverse effect" on appellants' protected activities,[121] the absence of any reason to believe that such a policy is being unlawfully pursued, coupled with the virtual tautology that no foreign intelligence policy could be one "not contingent upon executive [*i.e.*, Presidential] discretion," places appellants' claims for declaratory relief in the category of moot controversies.[122]

### C. *Remaining issues*

Although we agree with appellants that our disposition of the state secrets privilege in the present appeal in favor of appellees does not *by itself* suffice to dispose of the non-privilege-related discovery issues raised on appeal,[123] we find that such holding *coupled with* its consequences for the justiciability and remedial issues discussed above does operate to moot the remaining questions concerning the scope and method of discovery permitted in the district court. Because we find no significant differences between the four appellants dismissed for failure to make discovery[124] and the remaining appellants in terms of our resolution of the justiciability and remedial questions, we likewise find it unnecessary to explore the contention that dismissal was an inappropriate sanction.

Finally, since the district court's judgments of dismissal and summary judgment on the claims remaining after our decision in *Halkin I* are affirmed as to the appellees generally, we need not reach the issues of personal jurisdiction over appellees Osborn and Angleton. Judgment against them would be inappropriate regardless of a resolution of the personal jurisdiction question.

### IV. Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

*Judgment accordingly.*

119. It bears noting that while the *Super Tire* majority found the case not to be moot on the narrow ground set forth in text, four dissenting Justices *would* have held the case moot whether or not the challenged policy involved the exercise of discretion. The majority opinion in *Super Tire* is therefore properly read as marking the outermost boundaries of declaratory judgment actions satisfying the case-or-controversy requirement.

120. *See Division 580, Amal. Transit Union v. Central New York Regional Transportation Authority,* 578 F.2d 29, 33 (2d Cir. 1978).

121. 416 U.S. at 122, 94 S.Ct. at 1698. In view of our discussion of the appellants' standing to complain of that "presence," *supra* at 999–1000, the soundness of that assumption is open to question.

122. *See also Rizzo v. Goode,* 423 U.S. 362, 374, 96 S.Ct. 598, 605, 46 L.Ed.2d 561 (1976) (distinguishing *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) on ground that action there was "no mistaking that the defendants proposed to continue their unconstitutional policies").

The unanimous decision in *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) is consistent with our reading of *Super Tire* and our conclusion based thereon. There, the Court faced the mootness question in a case in which the plaintiff had challenged an ordinance which barred him from distributing antiwar handbills. Holding that "we cannot ignore" the fact that the United States involvement in Vietnam had ended during the pendency of the litigation, *id.* at 460, 94 S.Ct. at 1216, the Court remanded for a finding on whether the plaintiff still desired to distribute handbills. Although here there is no question raised as to appellants' desires to continue to engage in dissident political activity, the critical point is that the provisions of law which burdened the protected interests in *Steffel*—a trespass ordinance—was *still in force* there, while in the present case, Operation CHAOS has terminated. *See Super Tire,* 416 U.S. at 123, 94 S.Ct. at 1698, quoted *supra* at p. 1005.

123. *See* discussion at p. 984 *supra.*

124. *See* pp. 987–988 *supra.*